Ashe Puri (SBN 297814)
MAYNARD COOPER & GALE, LLP
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 596-4344
apuri@maynardcooper.com

Brandon Stroy (SBN 289090)
MAYNARD COOPER & GALE, LLP
600 Montgomery Street, Suite 2600
San Francisco, CA 94111
Telephone: (415) 646-4703
bstroy@maynardcooper.com

Joshua Hartman (VA Bar No. 77894;
D.C. Bar No. 992165)
*(Pro Hac Vice* Application to be filed)
Hartman@adduci.com
Hayley Ostrin (TX Bar No. 24116862;
D.C. Bar No. 1720043)
(*Pro Hac Vice* Application to be filed)
Ostrin@adduci.com
ADDUCI MASTRIANI &
SCHAUMBERG LLP
1133 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 467-6300

*Attorneys for Plaintiff ARK Diagnostics, Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| ARK DIAGNOSTICS, INC., a California Corporation<br><br>       Plaintiff,<br><br>   v.<br><br>ACRO BIOTECH, INC., a California Corporation, HANGZHOU ALLTEST BIOTECH CO., LTD., and DOES 1-10, inclusive<br><br>      Defendants. | Case No. 5:21-cv-00871<br><br>**COMPLAINT FOR INFRINGEMENT OF U.S. PATENT NO. 10,203,345**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff ARK Diagnostics, Inc. ("ARK" or "Plaintiff") states and alleges as follows:

## SUMMARY OF THE DISPUTE

1.    This is an action for patent infringement arising under the patent laws of the United States of America, including specifically 35 U.S.C. § 271(a)-(c), based on Defendants Hangzhou AllTest Biotech Co., Lt. ("AllTest") and Acro Biotech, Inc.'s ("Acro") (collectively, "Defendants") willful infringement of United States Patent No. 10,203,345 (the "'345 Patent) by the unauthorized use, offer for sale, sale, and/or importation of Defendants' infringing gabapentin immunoassay rapid drug tests accused below ("the Accused Product"), and by their inducement of and contribution to infringement of the '345 Patent.

2.    ARK is a pioneer in the therapeutic drug monitoring ("TDM") and urine drug testing ("UDT") markets, which include assays and tests to detect and monitor the presence of therapeutic and illicit drugs and other small molecules. Since its incorporation in 2003, ARK's mission has been to improve healthcare through the design, research and development, manufacture, and distribution of in vitro diagnostic ("IVD") immunoassays for TDM and UDT. ARK's innovations include its homogeneous enzyme immunoassay technology, which it introduced for the next generation of clinical laboratory testing. This technology includes the ARK Gabapentin Assay, an immunoassay capable of rapidly detecting the presence of gabapentin, an entirely new field in the TDM and UDT markets. The '345 Patent protects the ARK Gabapentin Assay.

3.    The products and processes covered by the '345 Patent relate to immunoassays for detecting the presence of gabapentin in a biological sample. Gabapentin (trade name Neurontin) is a chemical compound used as an anti-seizure and anti-convulsant medication that has the following chemical structure:

*Figure 1 – Chemical Structure of Gabapentin*

4.      Patients can metabolize gabapentin at different rates. As a result, two patients who receive the same dose of gabapentin may experience different levels of serum drug concentration, which will result in inconsistent therapeutic effects. Thus, monitoring a patient's concentration level of gabapentin is essential to determining the correct dosage to prescribe.

5.      Apart from its therapeutic uses, gabapentin has become popular as a drug of abuse, which users take in tandem with opioids to increase their potency.[1] When abused with opioids, gabapentin increases the risk of respiratory problems and fatal overdose.[2] The growing abuse of gabapentin has led to demand for quick, accurate, and inexpensive methods for testing the presence of gabapentin in a test subject's biological sample.

6.      ARK researched, developed, and invented novel methods and compounds for assaying gabapentin that can be used to test for the presence of gabapentin quickly, accurately, and inexpensively. ARK's gabapentin immunoassay products use antibodies, enzymes, and a substrate to test for the presence of gabapentin and gabapentin conjugates in a biological sample. When gabapentin is absent from a

---

[1] *See* Alyssa M. Peckham et. al., *Gabapentin use, abuse, and the US opioid epidemic: the case for reclassification as a controlled substance and the need for pharmacovigilance*, 11 RISK MANAG. HEALTHCARE 11, 109, 110 (2018), www.ncbi.nlm.nih.gov/pmc/articles/PMC6103607/pdf/rmhp-11-109.pdf.

[2] *Id*. at 109; *FDA warns about serious breathing problems with seizure and nerve pain medicines gabapentin (Neurontin, Gralise, Horizant) and pregabalin (Lyrica, Lyrica CR)*, FDA (last updated Jan. 30, 2020), www.fda.gov/drugs/drug-safety-and-availability/fda-warns-about-serious-breathing-problems-seizure-and-nerve-pain-medicines-gabapentin-neurontin.

sample, the gabapentin-specific antibody binds to the enzyme, preventing the enzyme from producing NADH. Conversely, when gabapentin is present, the antibody binds to the gabapentin, allowing the enzyme to bind to the substrate and produce NADH. NADH levels can then be measured and used to determine the presence and concentration of gabapentin.



*Figure 2 - ARK Gabapentin Assay, which includes*
*Reagent R1 – Antibody/Substrate; and Reagent R2 – Enzyme.*

7.     ARK's Gabapentin Assay can be used with clinical analyzers to test for the presence and concentration levels of gabapentin and gabapentin conjugates in a patient's biological sample. To do so, a known quantity of Reagent R1 is mixed with the biological sample. Reagent R1 contains rabbit polyclonal antibodies that specifically bind to gabapentin as well as nicotinamide adenine dinucleotide ("NAD"). If the sample contains gabapentin, Reagent R1's antibodies will bind to the free gabapentin. When Reagent R2 is introduced, these bound antibodies will not be free to bind to the enzyme-tagged gabapentin. Reagent R2 contains gabapentin conjugated at the carboxyl group to bacterial glucose-6-phosphate dehydrogenase ("G6PDH"). When G6PDH is active, it converts NAD to NADH, which changes the way the solution absorbs light. Conversely, if the sample does not contain gabapentin, Reagent R1's antibodies will bind to Reagent R2's enzyme-tagged gabapentin, in turn inhibiting production of NADH. A spectrometer can measure this change in

absorbance with enough specificity to allow users to determine appropriate dosage rates.



*Figure 3 - Diagram of ARK Gabapentin Assay's Response to Different Samples*

8.    In addition to use with a clinical chemistry analyzer, ARK's gabapentin-specific antibodies can be and are used in competitive lateral flow test strips in cups, dip-cards, and other test formats for performing rapid drug tests without using specialized equipment. Lateral flow tests include gabapentin antibodies deposited on the test's "dip zone" that are designed to bind with gabapentin and specific gabapentin conjugates. In these lateral flow tests, the gabapentin antibodies are labeled with a marker, such as a gold microparticle, that becomes visible to the naked eye when antibodies concentrate in a small enough area. Gabapentin lateral flow tests also include a "test line" that includes unbound gabapentin molecules and a "control line" that includes gabapentin antibodies that bind with excess labeled antibody.



*Figure 4 - Diagram of Gabapentin Lateral Flow Test*

9.    When a biological sample, such as a blood or urine sample, is added to the dip zone, the sample diffuses along the strip, carrying the gabapentin antibodies. A properly functioning strip will carry the sample, including the gabapentin antibodies

dispersed within it, all the way to the control line. The antibodies bind to free gabapentin and specific gabapentin conjugates on a first-come, first-serve basis. Because the tagged antibodies are located at the test strip's dip zone, they interact with the biological sample before reaching the gabapentin on the test line. If the biological sample contains gabapentin, the tagged antibodies will bind to the sample's gabapentin and not to the gabapentin on the test line. All the tagged antibodies then flow to the control line, resulting in a single-line, positive test. If the sample contains little or no gabapentin, the tagged antibodies are free to bind to the gabapentin on the test line, at a concentration significant enough to make the test line visible. Excess tagged antibodies will flow to the control line, resulting in a double-line, negative test.



*Figure 5 - Diagram of Positive and Negative Gabapentin Lateral Flow Tests*

10.     ARK has entered into a Licensing and Supply Agreement with Advin Biotech Inc ("Advin"). Advin uses components of ARK's Gabapentin Immunoassay to create rapid drug tests that practice the '345 Patent.

11.     On December 1, 2020, Plaintiff filed a complaint at the International Trade Commission, alleging that Defendants' infringement of the '345 Patent resulted in a violation of 19 U.S.C. § 1337. Plaintiff amended its complaint on December 23, 2020, and the International Trade Commission instituted *Certain Gabapentin Immunoassay Kits and Test Strips, Components Thereof, and Methods Therefor*, Inv. No. 337-TA-1239, on January 19, 2021.

## THE PARTIES

12.     Plaintiff ARK Diagnostics, Inc. is a California corporation founded in 2003. ARK's principal place of business is located at 48089 Fremont Boulevard,

Fremont, California 94538.

13.     Defendant Acro Biotech, Inc. is a California corporation. Acro maintains its principal place of business at 9500 7th Street, Unit M, Rancho Cucamonga, CA 91730.

14.     Defendant Hangzhou AllTest Biotech Co., Ltd. is a company organized under the laws of the Peoples Republic of China maintaining its principal place of business at No. 550, Yinhai Street, Hangzhou Economy and Technology Development Area, Hangzhou, China, 310018.

15.     ARK does not know the true names and capacities of the Defendants sued herein as Does 1 through 10, inclusive, and therefore sues these Defendants by their fictitious names. Pursuant to Federal Rules of Civil Procedure 15(a)(2) and 21, ARK will seek leave to amend this Complaint to allege the true names and capacities of Does 1 through 10, inclusive, when ascertained.

## **JURISDICTION**

16.     This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

17.     Defendant Acro is subject to personal jurisdiction in the State of California, including within this judicial district, because it is a California corporation and because it has its principal place of business within this judicial district.

18.     On information and belief, Defendant AllTest is subject to personal jurisdiction in the State of California, including within this judicial district, because AllTest carries on continuous and systematic business in the State of California. Among other things, AllTest's U.S. agent registered with the U.S. Food and Drug Administration resides in California within this district. Further, as noted above, AllTest's wholly owned subsidiary Acro is located in California within this district, and on information and belief, AllTest regularly imports, sells, and distributes products, including accused products, for marketing, distribution, and resale to California and in particular to this district.

19.   In addition, AllTest has committed acts of infringement in California within this district that give rise to this action by purposefully and voluntarily placing the accused products into the stream of commerce with the intention and expectation that they will be resold and distributed within California. On information and belief, AllTest has sold and distributed accused products to its wholly owned subsidiary Acro, which resides within this district, with the understanding that Acro would resell and distribute those products within this district. Therefore, AllTest has sufficient minimum contacts with California, such that exercising jurisdiction over AllTest is appropriate under the applicable jurisdictional statutes and would not offend traditional notions of fair play and substantial justice.

## VENUE

20.   Venue is proper in this district under 28 U.S.C. §§ 1391(c)(3) and 1400(b) because Defendant AllTest resides outside the United States in Hangzhou, China and Defendant Acro resides within this judicial district, as alleged above.

## THE PATENTS IN SUIT

21.   The '345 Patent generally discloses and claims a method of detecting gabapentin by combining a target sample, an anti-gabapentin antibody, and a gabapentin conjugate in which a detectable label is bound to a gabapentin molecule via one of three specific chemical structures—GAB-II, GAB-V, or GAB-VII. In general, the target samples are biological samples (such as urine samples) suspected of containing gabapentin. The anti-gabapentin antibody is capable of binding with gabapentin or gabapentin conjugates. Any free gabapentin in the sample will form complexes with the anti-gabapentin antibodies, making the antibodies unavailable to bind with the gabapentin conjugate when it is introduced into the sample. The output of the conjugated label is affected by the presence or absence of the antibody-gabapentin conjugate complex. This method detects the presence and concentration of gabapentin in the sample based on the label's output.

22.   The '345 Patent also generally discloses and claims a gabapentin

immunoassay kit including an anti-gabapentin antibody and a gabapentin conjugate comprising a detectable label bound to a gabapentin molecule via one of the GAB-II, GAB-V, and GAB-VII structures. The claimed kit can be used for performing identifying the presence or absence of gabapentin in a sample.

### Defendants' Infringing Activities

23.    On information and belief, Defendants make, use, sell, offer for sale, and/or import gabapentin immunoassay products that infringe the '345 Patent.

24.    Defendants infringe the '345 Patent at least by importing, selling, and offering for sale gabapentin immunoassay kits, gabapentin-specific test strips, and multi-drug test kits and strips that test for gabapentin among other drugs that practice one or more claims of the '345 Patent. On information and belief, Defendant AllTest manufactures accused products in China. AllTest imports these accused products into the U.S. by shipping them to its wholly owned subsidiary, Defendant Acro, which markets, sells, and offers for sale accused products on its own and through independent distributors. These accused products include a "GAB Rapid Test Panel," which Defendant AllTest and Acro advertise on their websites (*see, e.g.*, Exs. 2, 3) and their distributors advertise as an "AllTest/Acro Biotech" product. (*See* Ex. 4.)

25.    Defendants' actions have irreparably harmed ARK and will continue to do so unless they permanently cease. Continued sales of Defendants' accused products will further damage ARK's market position and good reputation in the marketplace. In addition, Defendants' continued knowing acts of infringement will frustrate ARK's ongoing and potential business relationships and contracts, with resulting lost sales and profits, and are otherwise causing or will cause substantial irreparable harm to ARK's business.

26.    As a result of Defendants' actions, ARK was forced to file this lawsuit to protect its patented invention and its reputation as a leader in the IVD industry.

27.    Defendants' accused products, including their Gabapentin Rapid Test Panel, practice one or more claims of the '345 Patent. Defendants' Gabapentin Rapid

Test Panel meets each and every limitation of independent claims 1 and 28. To the extent that the accused products do not literally meet a claim limitation, they meet them under the doctrine of equivalents.

28.    As shown below, during ordinary use, the accused products practice every step of the method of independent claim 1:

| Claim 1 | Defendants' Gabapentin Rapid Test Panel |
|---|---|
| A method for detecting the presence or absence of gabapentin in a sample, the method comprising: | Defendants' accused products, including its Gabapentin (GAB) Rapid Test Panel are one-step, competitive lateral flow immunoassay tests for detecting the presence or absence of gabapentin in a biological sample.<br><br>**GAB Rapid Test Panel (Urine) Package Insert**<br>*A rapid test for the qualitative detection of Gabapentin in human urine.*<br>*For forensic use only.*<br>【INTENDED USE】<br>The GAB Rapid Test panel (Urine) is a rapid chromatographic immunoassay for the detection of Gabapentin in urine at a cut-off concentration of 2000ng/ml. This test will detect other related compounds, please refer to the Analytical Specificity table in this package insert. This assay provides only a qualitative, preliminary analytical test result. A more specific alternate chemical method must be used in order to obtain a confirmed analytical result. Gas chromatography/mass spectrometry (GC/MS) is the preferred confirmatory method. Clinical consideration and professional judgment should be applied to any drug of abuse test result, particularly when preliminary positive results are used.<br><br>*(Excerpt of Defendants' Product Insert)* |

| Claim 1 | Defendants' Gabapentin Rapid Test Panel |
|---|---|
| (a) combining in a reaction mixture: | Defendants' accused products combine certain recited substances in a reaction mixture. When used as intended, a biological sample is introduced to the dip card's test strip. The sample and anti-gabapentin antibodies placed on the test strip diffuse to the strip's test zone, where they react with the gabapentin conjugate deposited on the strip.<br><br>【PRINCIPLE】<br>The GAB Rapid Test Panel (Urine) is an immunoassay based on the principle of competitive binding. Drugs which may be present in the urine specimen compete against the drug conjugate for binding sites on the antibody.<br>During testing, a urine specimen migrates upward by capillary action. Gabapentin, if present in the urine specimen below the cut-off level, will not saturate the binding sites of the antibody in the test. The antibody coated particles will then be captured by immobilized Gabapentin-protein conjugate and a visible colored line will show up in the test line region. The colored line will not form in the test line region if the Gabapentin level exceeds the cut-off level, because it will saturate all the binding sites of anti-Gabapentin antibody.<br>A drug-positive urine specimen will not generate a colored line in the test line region because of drug competition, while a drug-negative urine specimen or a specimen containing a drug concentration less than the cut-off will generate a line in the test line region. To serve as a procedural control, a colored line will always appear at the control line region indicating that proper volume of specimen has been added and membrane wicking has occurred.<br><br>*(Excerpt of Defendants' Product Insert)* |
| (i) a sample suspected of containing gabapentin; | During ordinary use, samples suspected of containing gabapentin are introduced into a reaction mixture on the test strip of the accused products.<br><br>**GAB Rapid Test Panel (Urine) Package Insert**<br>*A rapid test for the qualitative detection of Gabapentin in human urine.*<br>*For forensic use only.*<br>【INTENDED USE】<br>The GAB Rapid Test panel (Urine) is a rapid chromatographic immunoassay for the detection of Gabapentin in urine at a cut-off concentration of 2000ng/ml. This test will detect other related compounds, please refer to the Analytical Specificity table in this package insert.<br>• • •<br>**Analytical Specificity**<br>The following table lists compounds that are positively detected in urine by the GAB Rapid Test Panel (Urine) at 5 minutes.<br>Compound    Concentration(ng/ml)<br>Gabapentin    2000<br><br>*(Excerpts of Defendants' Product Insert)* |
| (ii) an anti-gabapentin antibody capable of forming of a | The accused products contain anti-gabapentin antibodies that are capable of forming a complex with gabapentin present in the sample. The |

| Claim 1 | Defendants' Gabapentin Rapid Test Panel |
|---|---|
| complex with gabapentin that may be present in the sample; and | antibodies specifically bind gabapentin epitopes present in free gabapentin, whether contained in a test subject's urine sample or pre-placed at the accused products' test line (denoted "T"). <br><br> 【PRINCIPLE】<br>The GAB Rapid Test Panel (Urine) is an immunoassay based on the principle of competitive binding. Drugs which may be present in the urine specimen compete against the drug conjugate for binding sites on the antibody.<br>During testing, a urine specimen migrates upward by capillary action. Gabapentin, if present in the urine specimen below the cut-off level, will not saturate the binding sites of the antibody in the test. The antibody coated particles will then be captured by immobilized Gabapentin-protein conjugate and a visible colored line will show up in the test line region. The colored line will not form in the test line region if the Gabapentin level exceeds the cut-off level, because it will saturate all the binding sites of anti-Gabapentin antibody.<br>A drug-positive urine specimen will not generate a colored line in the test line region because of drug competition, while a drug-negative urine specimen or a specimen containing a drug concentration less than the cut-off will generate a line in the test line region. To serve as a procedural control, a colored line will always appear at the control line region indicating that proper volume of specimen has been added and membrane wicking has occurred.<br>【REAGENTS】<br>The test contains mouse monoclonal anti-Gabapentin antibody coupled particles and Gabapentin-protein conjugate. A goat antibody is employed in the control line system.<br><br> *(Excerpt of Defendants' Product Insert)* <br><br> When the accused products are used on a urine sample containing gabapentin molecules, the molecules bind to antibodies contained on the dip zone, preventing them from binding to fixed gabapentin-conjugates preplaced at the test line, such that the test line will not display a visual marker. Alternatively, when the accused products are used for a urine sample that does not contain gabapentin molecules, unbound antibodies bind to the preplaced gabapentin conjugates at the test line, such that the test line will display a visual marker. |

| Claim 1 | Defendants' Gabapentin Rapid Test Panel |
|---|---|
| |  |

(*Diagram of Competitive Lateral Flow Assay*)

【DIRECTIONS FOR USE】
Allow the test, urine specimen, and/or controls to reach room temperature (15-30°C) prior to testing.
1. Remove the test panel from the sealed pouch and use it as soon as possible.
2. Remove the cap.
3. With the arrow pointing toward the urine specimen, immerse the test panel vertically in the urine specimen for at least 10 to 15 seconds. Immerse the strip to at least the level of the wavy lines, but do not touch the plastic device.
4. Replace the cap and place the test panel on a non-absorbent flat surface.
5. Start the timer and wait for the colored line(s) to appear.
6. The result should be read at 5 minutes. Do not interpret the result after 10 minutes.

【INTERPRETATION OF RESULTS】
(Please refer to the illustration)
**NEGATIVE:* Two lines appear.** One colored line should be in the control line region (C), and another apparent colored line should be in the test line region (T). This negative result indicates that the Gabapentin concentration is below the detectable cut-off level.

. . .

**\*NOTE:** The shade of color in the test line region (T) may vary, but it should be considered negative whenever there is even a faint colored line.
**POSITIVE: One colored line appears in the control line region (C).** No line appears in the test line region (T). This positive result indicates that the Gabapentin concentration exceeds the detectable cut-off level.
**INVALID: Control line fails to appear.** Insufficient specimen volume or incorrect procedural techniques are the most likely reasons for control line failure. Review the procedure and repeat the test with a new test. If the problem persists, discontinue using the test kit immediately and contact your local distributor.

**Analytical Sensitivity**
A drug-free urine pool was spiked with Gabapentin at the following concentrations: 0ng/ml, 1000ng/ml, 1500ng/ml, 2000ng/ml, 2500ng/ml, 3000ng/ml and 6000ng/ml. The result demonstrates >99% accuracy at 50% above and 50% below the cut-off concentration. The data are summarized below:

| Gabapentin Concentration (ng/ml) | Percent of Cut-off | n | Visual Result | |
|---|---|---|---|---|
| | | | Negative | Positive |
| 0 | 0 | 30 | 30 | 0 |
| 1000 | -50% | 30 | 30 | 0 |
| 1500 | -25% | 30 | 28 | 2 |
| 2000 | Cut-off | 30 | 16 | 14 |
| 2500 | +25% | 30 | 3 | 27 |
| 3000 | +50% | 30 | 0 | 30 |
| 6000 | 3X | 30 | 0 | 30 |

**Analytical Specificity**
The following table lists compounds that are positively detected in urine by the GAB Rapid Test Panel (Urine) at 5 minutes.

| Compound | Concentration(ng/ml) |
|---|---|
| Gabapentin | 2000 |

(*Excerpt of Defendants' Product Insert, describing product limitations*)

| Claim 1 | Defendants' Gabapentin Rapid Test Panel |
|---|---|
| (iii) a gabapentin conjugate capable of binding to the anti-gabapentin antibody, wherein the gabapentin conjugate has the structure:<br><br><br><br>Wherein:<br>$R_1$, $R_2$, or $R_3$ is —X—W-L-Z;<br>when $R_1$ is —X—W-L-Z, X is NH, $R_2$ is —OH, and $R_3$ is —H;<br>when $R_2$ is —X—W-L-Z, X is NH, $R_1$ is —$NH_2$, and $R_3$ is —H; and<br>when $R_3$ is —X—W-L-Z, X is a heteroatom or | The accused products include a gabapentin conjugate capable of binding to the afore-mentioned anti-gabapentin antibodies. On information and belief, this gabapentin conjugate has the recited R1 structure of —X—W-L-Z, in which X is NH, W is a lower alkyl group or carbonyl group, L is a linker or at least one bond between W and Z, and Z is a "detectable label."<br><br>Per the product's package insert, the accused dip card includes a "Gabapentin-protein conjugate"—i.e., a gabapentin-protein conjugate—deposited in the test region. During use of the dip card as intended with a sample containing gabapentin levels below the cut-off concentration for a positive result, the dip card's anti-gabapentin will "[t]he antibody coated particles will then be captured by immobilized Gabapentin-protein conjugate and a visible colored line will show up in the test line region" indicating a negative result.<br><br>【PRINCIPLE】<br>The GAB Rapid Test Panel (Urine) is an immunoassay based on the principle of competitive binding. Drugs which may be present in the urine specimen compete against the drug conjugate for binding sites on the antibody.<br>During testing, a urine specimen migrates upward by capillary action. Gabapentin, if present in the urine specimen below the cut-off level, will not saturate the binding sites of the antibody in the test. The antibody coated particles will then be captured by immobilized Gabapentin-protein conjugate and a visible colored line will show up in the test line region. The colored line will not form in the test line region if the Gabapentin level exceeds the cut-off level, because it will saturate all the binding sites of anti-Gabapentin antibody.<br>A drug-positive urine specimen will not generate a colored line in the test line region because of drug competition, while a drug-negative urine specimen or a specimen containing a drug concentration less than the cut-off will generate a line in the test line region. To serve as a procedural control, a colored line will always appear at the control line region indicating that proper volume of specimen has been added and membrane wicking has occurred.<br>【REAGENTS】<br>The test contains mouse monoclonal anti-Gabapentin antibody coupled particles and Gabapentin-protein conjugate. A goat antibody is employed in the control line system.<br><br>(Excerpt of Defendants' Product Insert)<br><br>The appearance of a colored line in the accused |

| Claim 1 | Defendants' Gabapentin Rapid Test Panel |
|---|---|
| lower alkyl group, $R_1$ is —NH2, and $R_2$ is —OH; W is a lower alkyl group or carbonyl group; L is a linker or at least one bond between W and Z; and Z is a detectable label; | products' test zone when the card's anti-gabapentin antibodies bind with its Gabapentin-protein conjugate is a detectable signal, such that the protein is a detectable label as recited in claim 1. |
|  | Further, testing of the accused products shows that the anti-gabapentin antibodies included with the dip card specifically bind to gabapentin conjugates having a GAB-II structure, which in turn indicates that the gabapentin conjugates included with the accused dip card also have a GAB-II structure—just like the R1 structure recited in claim 1. Specifically, when testing the accused dip card with samples containing gabapentin conjugates having GAB-II, GAB-V, and GAB-VII structures respectively, the accused product indicated a positive result only with the GAB-II sample and not with the GAB-V or GAB-VII samples. As shown below, the accused dip card's test line indicated a positive result for the GAB-II sample (no visual marker at the "T" line) and negative results with the GAB-V and GAB-VII conjugates and for a control sample that did not include gabapentin. |

| Sample ID | Acro Biotech, Inc. (Cucamonga, CA) Mercedes Medical Inc. (Sarasota, FL) Hangzhou AllTest Biotech Co.,Ltd (China) | Description | Protein Conc. (mg/mL) | Lot# |
|---|---|---|---|---|
| G6PDH (control) | | 0.5 mg/mL glucose-6-phosphate dehydrogenase (G6PDH) in 12.5 mM PBS buffer | | NB087-78G6PDH |
| Gab VII Enzyme (G6PDH) Conjugate | | Gabapentin linked to glucose-6-phosphate dehydrogenase (G6PDH) at the carboxyl group of gabapentin in 12.5 mM PBS buffer | 0.5 | NB087-78GBVII |
| Gab II Enzyme (G6PDH) Conjugate | | Gabapentin linked to glucose-6-phosphate dehydrogenase (G6PDH) at the amino group of gabapentin in 12.5 mM PBS buffer | 0.5 | NB087-78GBII |
| Gab V Enzyme (G6PDH) Conjugate | | Gabapentin linked to glucose-6-phosphate dehydrogenase (G6PDH) at the cyclohexane group of gabapentin in 12.5 mM PBS buffer | 0.5 | NB087-78GBV |

(Photograph of gabapentin conjugate test results chart with the accused dip card)

Based on this testing, the accused products' anti-gabapentin antibodies form complexes with GAB-II conjugates and not with other gabapentin conjugates. Consequently, the gabapentin conjugates included on the accused dip card during manufacture must also have a GAB-II structure, as recited in claim 1, or else these conjugates would not form complexes with the dip card's anti-gabapentin antibodies.

In addition, by its nature, the dip card's Gabapentin-protein conjugate must include "at least one bond" between the conjugate's protein and its gabapentin molecule, as required by claim 1.

Finally, on information and belief, the remaining portions of claim 1's R1 structure—NH and either a

| Claim 1 | Defendants' Gabapentin Rapid Test Panel |
|---|---|
| | "lower alkyl group or a carbonyl group"—are present based on the GAB-II structure of the conjugate and the methods and chemicals typically used for conjugation. |
| (b)   detecting the presence or absence of the complex, wherein the presence or absence of the complex is indicative of the presence or absence of gabapentin in said sample. | The accused products perform the step of detecting the presence or absence of the antibody-gabapentin complex, which is indicative of the presence or absence of gabapentin in the sample. When the dip card is used as directed, its test strip is inserted into a biological sample, causing diffusion to occur along the test strip, creating the recited reaction mixture. If gabapentin is present in the sample, the anti-gabapentin antibodies deposited on the test strip form complexes with the free gabapentin present in the sample. Because the anti-gabapentin antibodies have formed complexes with the free gabapentin, they are not available to bind with the gabapentin conjugates deposited on the test strip's test line. As such, the test line does not display a marker, which indicates that gabapentin is present in the sample.   If gabapentin is absent from the sample, the anti-gabapentin antibodies deposited on the test strip do not form complexes with anything in the sample and thus are free to bind with the deposited gabapentin conjugates as the mixture diffuses along the test strip. The binding of the antibodies with the gabapentin |

| Claim 1 | Defendants' Gabapentin Rapid Test Panel |
|---------|------------------------------------------|
|         | conjugates causes a visual marker to display at the strip's test line, indicating that gabapentin is absent from the sample.  *(Excerpt of Defendants' Product Insert)* |

29. In addition, the accused products meet each and every limitation of independent claim 28, which is directed to "[a] kit" comprising "an anti-gabapentin antibody, capable of specifically binding to gabapentin" and "a gabapentin conjugate capable of binding to the anti-gabapentin antibody" and having one of the same three structures required by claim 1. For the same reasons provided regarding the "anti-

gabapentin antibody" and "gabapentin conjugate" limitations of claim 1, the accused products meet these limitations of claim 28.

## FIRST CAUSE OF ACTION

### Infringement of U.S. Patent No. 10,203,345

30.    Plaintiff incorporates and realleges the allegations in the preceding paragraphs as if fully set forth here.

31.    On February 2, 2019, the United States Patent and Trademark Office duly and legally issued the '345 Patent, titled "Compounds and Methods for Use in Detecting Gabapentin." A true and correct copy of the '345 patent is attached as Exhibit 1.

32.    ARK is the owner, by assignment, of all rights, title, and interest in the '345 Patent, including the right to recover damages for past infringement.

33.    Defendants have infringed and continue to infringe the '345 Patent, both literally and by equivalents, under 35 U.S.C. § 271(a) in this district and elsewhere in the United States by using, importing, offering for sale, and/or selling the accused products, which practice one or more of the claims of the '345 Patent. The accused products satisfy each limitation of at least independent claims 1 and 28. (*See supra* ¶¶ 28–29.)

34.    On information and belief, Defendants have actively induced and contributed to infringement of one or more claims of the '345 Patent under 35 U.S.C. § 271(b) and (c). Defendants have had knowledge of the '345 Patent at least since December 1, 2020, when ARK filed a complaint with the U.S. International Trade Commission under Section 337 of the Tariff Act of 1930 asserting the '345 Patent against Defendants.

35.    Defendants have induced infringement of one or more claims of the '345 Patent, both literally and by equivalents, under 35 U.S.C. § 271(b). On information and belief, Defendants have actively, knowingly, and intentionally induced infringement of the '345 Patent by selling, offering to sell, advertising, marketing, and distributing

accused products with the knowledge and specific intent that third parties will use them to infringe the '345 Patent during ordinary and customary use of those products. Defendants have actively encouraged third parties, including customers and end users, to use the accused products in an infringing manner, including: (1) by marketing those products for use in gabapentin UDT, including through websites (*see*, *e.g.*, 2-4); (2) by selling, offering for sale, and distributing the accused products to third parties and end users; and (3) by providing instructions, including package inserts supplied with the accused products, that direct third parties to use those products in an infringing manner (*see*, *e.g.*, Ex. 5).

36.    On information and belief, Defendants have contributorily infringed one or more claims of the '345 Patent, both literally and by equivalents, under 35 U.S.C. § 271(c). Within the United States, Defendants have sold, offered to sell, and/or imported the accused products with the knowledge that they are especially made or adapted for use in infringing the '345 Patent. (*See supra* ¶¶ 28-29.) Further, the accused products are not staple articles or commodities of commerce suitable for substantial noninfringing use. For example, they are not intended and cannot be used substantially for testing for drugs of abuse other than gabapentin.

37.    As a result of Defendants' infringement of the '345 Patent, ARK has suffered and will continue to suffer damages. ARK is entitled to recover from Defendants damages adequate to compensate for such infringement, in an amount to be determined at trial.

38.    Defendants have committed acts of infringement of the '345 Patent discussed above with full knowledge of ARK's rights in the patent. On information and belief, and as discussed above, Defendants received notice of their infringing activities at least by ARK's December 1, 2021 complaint filed with the U.S. International Trade Commission. On information and belief, Defendants continued infringing acts after that date, including by continuing to market the accused products and to offer them for sale, such as through their websites, despite an objectively high

likelihood that their actions constitute direct and/or indirect infringement of valid patents. Defendants knew or should have known of that objectively high risk since before the filing of this Complaint. Defendants' acts constitute willful and deliberate infringement, entitling ARK to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that:

A. A judgment is entered against Defendants on all claims;

B. That Defendants have infringed the '345 Patent, both literally and by equivalents;

C. That Defendants have induced infringement of the '345 Patent, both literally and by equivalents;

D. That Defendants have contributed to infringement of the '345 Patent, both literally and by equivalents;

E. That Defendants have willfully infringed the '345 Patent;

F. That the '345 Patent is valid and enforceable;

G. That Defendants, their officers, agents, and employees, those persons in active concert of participation with any of them, and their successors and assigns be permanently enjoined from infringing the '345 Patent, including but not limited to an injunction against making, using, offering to sell, and selling within the United States, and importing into the United States, products covered by the '345 Patent;

H. For an accounting for any infringing sales not presented at trial and an award by the Court of additional damages for any such infringing sales;

I. That Defendants be ordered to account for and pay to ARK the damages resulting from Defendants' infringement of the '345 Patent, including lost profits, together with interest and costs, and all other damages permitted by 35 U.S.C. § 284, including enhanced damages up to three times the amount

of damages found or measured, but in any event no less than a reasonable royalty;

J. That ARK be awarded such other equitable or legal relief as this Court deems just and proper under the circumstances.

DATED:   Los Angeles, California, May 19, 2021.

/s/ Ashe Puri

Ashe Puri (SBN 297814)
MAYNARD COOPER & GALE, LLP
Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 596-4344
apuri@maynardcooper.com

Brandon Stroy (SBN 289090)
MAYNARD COOPER & GALE, LLP
600 Montgomery Street, Suite 2600
San Francisco, CA   94111
Telephone: (415) 646-4703
bstroy@maynardcooper.com

*Attorneys for Plaintiff ARK Diagnostics, Inc.*

1

## __JURY DEMAND__

2

Plaintiff hereby requests a trial by jury in this matter.

3

4

DATED:   Los Angeles, California, May 19, 2021.

5

6

/s/ Ashe Puri

7

Ashe Puri (SBN 297814)
MAYNARD COOPER & GALE, LLP

8

Century Park East, Suite 1700
Los Angeles, CA 90067

9

Telephone: (310) 596-4344

10

apuri@maynardcooper.com

11

Brandon Stroy (SBN 289090)

12

MAYNARD COOPER & GALE, LLP
600 Montgomery Street, Suite 2600

13

San Francisco, CA   94111

14

Telephone: (415) 646-4703
bstroy@maynardcooper.com

15

16

*Attorneys for Plaintiff ARK*
*Diagnostics, Inc.*

17

18

19

20

21

22

23

24

25

26

27

28